**PELTON GRAHAM LLC**
Brent E. Pelton (BP 1055)
Taylor B. Graham (TG 9607)
Kristen E. Boysen (KB 0208)
111 Broadway, Suite 1503
New York, NY 10006
Telephone: (212) 385-9700
www.peltongraham.com

*Attorneys for Plaintiffs, the putative*
*FLSA Collective and Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **VICTOR BALLAST, LUIS SIMONE and MARQUIS RICHARDSON, Individually and On Behalf of All Others Similarly Situated,**<br><br>      **Plaintiffs,**<br><br>-against-<br><br>**WORKFORCE7 INC., CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., VALI INDUSTRIES, INC. and RONALD HILTON, Jointly and Severally,**<br><br>      **Defendants.** | 20 Civ. 03812 (ER)<br><br><br>**AMENDED CLASS & COLLECTIVE<br>ACTION COMPLAINT**<br><br><br>**Jury Trial Demanded** |

   Plaintiffs Victor Ballast ("Ballast"), Luis Simone ("Simone") and Marquis Richardson ("Richardson" and, together with Ballast and Simone, the "Plaintiffs"), individually and on behalf of all others similarly situated, as class representatives, upon personal knowledge as to themselves and upon information and belief as to other matters, allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are construction flaggers who worked for Defendants on public streets, roadways and sidewalks throughout New York City and New York State, pursuant to contracts with Consolidated Edison Company of New York, Inc. ("Con Ed"), and New York City and New York State public entities.

2.      For their work, Defendants paid Plaintiffs an hourly rate that did not include prevailing wages or supplemental benefits when they performed work on gas and electrical projects on New York City and New York State public streets, roadways and sidewalks. Further, Plaintiffs were not paid wages of any kind for time spent traveling between job sites and Defendants' office or between multiple job sites in the same workday or for time spent waiting for job assignments and picking up and returning mandatory time sheets and equipment, resulting in significant unpaid regular and overtime wages each week.

3.      Plaintiffs bring this action to recover unpaid minimum wages and overtime premium pay owed to them pursuant to both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* and the New York Labor Law ("NYLL"), §§ 650 *et seq.*  Plaintiffs also seek to recover unpaid prevailing wages, daily overtime and supplemental benefits which they and the members of the putative Class were entitled to receive for work, including weekend work, they performed pursuant to contracts entered into between Workforce7 Inc., Vali Industries, Inc., public utility companies such as Con Ed and/or state, city or local public entities, which required payment of prevailing wages.

4.      Plaintiffs also bring claims for unpaid wages pursuant to NYLL §§ 190 & 193, unpaid spread-of-hours premiums, for Defendants' failure to provide proper wage notices and wage statements pursuant to NYLL § 195. Plaintiffs bring a claim for unpaid call-in pay pursuant

to NY Comp. Codes R. & Regs. ("NYCRR") tit. 12 § 142-2.3 and NYCRR § 142-3.3 against

Defendants Workforce7, Inc. and Ronald Hilton (hereinafter the "Workforce7 Defendants").

5.       Plaintiffs bring their FLSA claims on behalf of themselves and all other similarly

situated employees of Defendants. Plaintiffs bring their NYLL claims on behalf of themselves and

a Federal Rule of Civil Procedure 23 ("Rule 23") class of all non-union flaggers employed by

Defendant Workforce7, Inc. over the six (6) year period preceding the filing of the initial complaint

in this matter. Plaintiffs bring their New York common law claims on behalf of themselves and a

Rule 23 sub-class of non-union flaggers who worked for Workforce7, Inc. at Con Ed job sites in

New York State over the six (6) year period preceding the filing of the initial complaint in this

matter.

<h2 style="text-align:center">JURISDICTION AND VENUE</h2>

6.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337

and 1343, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §

1367.

7.       In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA

pursuant to 29 U.S.C. § 216(b).

8.       Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants'

business is located in this district and a substantial part of the events or omissions giving rise to

the claims occurred in this district.

9.       This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§

2201 and 2202.

10.      On March 20, 2020, New York Governor Andrew M. Cuomo signed Executive

Order 202.8 in an effort to stem the spread of COVID-19, which tolls for thirty (30) days "any

specific time limit[s] for the commencement, filing, or service of any legal action, notice, motion or other process or proceeding" under any New York State laws or court procedural rules. The thirty (30)-day tolling period began on March 20, 2020 and continued until April 19, 2020. On April 7, 2020, Governor Cuomo signed Executive Order 202.14, which extended the tolling period to May 7, 2020. Subsequently, on May 7, 2020, Governor Cuomo issued Executive Order 202.28, tolling all statutes of limitations for an additional thirty (30) days through June 6, 2020. On June 6, 2020, Governor Cuomo issued Executive Order 202.38, tolling all statutes of limitations until July 6, 2020. On July 7, 2020, Governor Cuomo issued Executive Order 202.48 tolling all statutes of limitations until August 5, 2020. On August 5, 2020, Governor Cuomo issued Executive Order 202.55, which tolled all statutes of limitations until September 4, 2020. On September 4, 2020, Governor Cuomo signed Executive Order 202.60, which extended the tolling period an additional thirty (30) days to October 4, 2020. On October 4, 2020, Governor Cuomo issued Executive Order 202.67, which extended the tolling period to November 3, 2020.

## THE PARTIES

**Plaintiffs:**

11.  Plaintiff Ballast was, at all relevant times, an adult individual residing in Bronx County, New York.

12.  Plaintiff Simone was, at all relevant times, an adult individual residing in Bronx County, New York.

13.  Plaintiff Richardson was, at all relevant times, an adult individual residing in Bronx County, New York.

14.  Throughout the relevant time period, Plaintiffs performed work for Defendants on public streets, roadways and sidewalks throughout New York City and New York State.

15.     Plaintiffs consent in writing to be party to this action, pursuant to 29 U.S.C. § 216(b), and their consent forms are attached hereto.

**Defendants:**

16.     Defendant Workforce7 Inc. ("Workforce7") is an active New York corporation with its principal place of business located at 4226A White Plains Road, Bronx, New York 10466.

17.     Upon information and belief, Defendant Workforce7 additionally maintains an office at 470 Nepperhan Avenue, Suite 200, Yonkers, New York 10701.

18.     Defendant Consolidated Edison Company of New York, Inc. ("Con Ed") is an active New York Corporation with its principal place of business located at 4 Irving Place, New York, NY 10003.

19.     Defendant Vali Industries, Inc. ("Vali Industries") is an active New York Corporation with its principal place of business located at 285 Lombardy Street, Brooklyn, New York 11222.

20.     The Corporate Defendants listed in paragraphs 16, 18 and 19 are hereinafter referred to collectively as the "Corporate Defendants."

21.     At all relevant times, the Corporate Defendants have been and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

22.     Upon information and belief, at all relevant times, the Corporate Defendants had gross revenues in excess of $500,000.00.

23.     The Corporate Defendants are joint employers of Plaintiffs and the Collective Action Members and Class Members.

18.     Upon information and belief, Defendant Ronald Hilton ("Hilton" or the "Individual

Defendant" and, collectively with the Corporate Defendants, the "Defendants") is an owner and operator of Workforce7 who set the company's payroll policies, including the unlawful practices complained of herein.

19.     Defendants Workforce7 and Hilton are hereinafter referred to as the "Workforce7 Defendants."

20.     Upon information and belief, throughout the relevant time period, the Individual Defendant was in charge of determining Workforce7's policies with respect to payroll and otherwise running the business of Workforce7.

24.     In corporate filings with the New York State Department of State, Division of Corporations, Defendant Hilton is listed as the contact person for DOS Process for Workforce7 Inc.

25.     The Individual Defendant participated in the day-to-day operations of Workforce7 and acted intentionally in his direction and control of Plaintiffs and Workforce7's other similarly situated employees and is an "employer" pursuant to the FLSA, 29 U.S.C. § 203(d) and regulations thereunder, 29 C.F.R. § 791.2, as well as the NYLL § 2 and the regulations thereunder, and is jointly and severally liable with the Corporate Defendants.

26.     At all relevant times, Defendants have been and continue to be employers engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a). At all relevant times, Defendants jointly employed, and/or continue to employ, Plaintiffs and each of the Collective Action members within the meaning of the FLSA.

27.     At all relevant times, Plaintiffs and Class Members were jointly employed by Defendants within the meaning of the NYLL, §§ 2 and 651.

## FLSA COLLECTIVE ACTION ALLEGATIONS

28.     Pursuant to 29 U.S.C. §§ 206, 207 & 216(b), Plaintiffs bring their First and Second

Causes of Action as a collective action under the FLSA on behalf of themselves and the following

collective:

> All persons employed by Defendant Workforce7, Inc. at any time
> from May 15, 2017 through the entry of judgment in this case (the
> "Collective Action Period") who worked as non-union flaggers (the
> "Collective Action Members").

29.     A collective action is appropriate in this circumstance because Plaintiffs and the

Collective Action Members are similarly situated, in that they were all subjected to Defendants'

illegal policies of failing to pay minimum wages for all hours worked or overtime premiums for

work performed in excess of forty (40) hours each week. As a result of these policies, Plaintiffs

and the Collective Action Members did not receive legally-required minimum wages for all hours

worked or overtime premium payments for all hours worked in excess of forty (40) hours per week.

30.     Plaintiffs and the Collective Action Members have substantially similar job duties

and were paid pursuant to a similar, if not the same, payment structure.

## NEW YORK FED. R. CIV. P. 23 CLASS ALLEGATIONS

**The Unpaid Wages Class**

31.     Pursuant to the NYLL, Plaintiffs bring their Third through Ninth Causes of Action

under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following

class:

> All persons employed by Defendant Workforce7, Inc. at any time
> from May 15, 2014 through the entry of judgment in this case (the
> "Class Period") who worked as non-union flaggers (the "Class
> Members").

32.     The Class Members are readily ascertainable. The number and identity of the Class

Members are determinable from the records of Defendants. For purposes of notice and other

purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by any means permissible under Federal Rule of Civil Procedure.

33. <u>The Class Members are so numerous that joinder of all members is impracticable</u>.

34. Upon information and belief, there are in excess of forty (40) Class Members.

35. <u>Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual Class Members</u>. Such common questions will determine Defendants' liability to all (or nearly all) Class Members. These common questions include:

a. whether Defendants employed Plaintiffs and the Class Members within the meaning of the NYLL;

b. whether Defendants failed to keep true and accurate time records for all hours worked by Plaintiffs and the Class Members;

c. whether Defendants failed and/or refused to pay Plaintiffs and the Class Members wages for all hours worked;

d. whether Defendants failed and/or refused to pay Plaintiffs and the Class Members minimum wages for all hours worked;

e. whether Defendants failed to pay overtime wages to Plaintiffs and the Class Members for all hours worked over forty (40) in a given week;

f. whether Defendants failed and/or refused to pay Plaintiffs and the Class Members an extra hour of minimum wage when working shifts in excess of ten (10) hours or split shifts;

g. whether the Workforce7 Defendants failed and/or refused to pay Plaintiffs who were sent home after reporting to work at least four (4) hours, or the number of hours in their

regularly scheduled shifts, whichever was less;

h.   whether Defendants failed to provide Plaintiffs and the Class Members with a proper statement of wages with every wage payment as required by the NYLL;

i.   whether Defendants failed to provide proper wage notice to Plaintiffs and the Class Members at the beginning of their employment and when their wage rate(s) changed, as required by the NYLL;

j.   whether Defendants' failure to properly pay Plaintiffs and the Class Members lacked a good faith basis; and

k.   whether Defendants are liable for all damages claimed hereunder, including but not limited to compensatory damages, liquidated damages, interest, costs and disbursements and attorneys' fees.

36.   Plaintiffs' claims are typical of the Class Members' claims. Plaintiffs, like all Class Members, were construction flagger employees of Defendants who worked for Defendants pursuant to their corporate policies. Plaintiffs, like all Class Members, were, *inter alia*, not paid minimum wages for all hours worked; were not paid overtime wages for all hours worked over forty (40) in a given workweek; were not paid wages of any kind for certain hours worked, including time spent waiting for job assignments, traveling to, from and between Defendants' office and the job sites; were not paid spread-of-hours premiums when working a shift of ten (10) or more hours and/or a split shift; were not paid call-in pay of four (4) hours, or the number of hours in their regularly scheduled shifts (whichever was less) when they were sent home from the Workforce7 office without being assigned work, and were not provided with proper wage notices and wage statements. If Defendants are liable to Plaintiffs for the claims enumerated in this Complaint, they are also liable to all Class Members.

9

37.     <u>Plaintiffs and their Counsel will fairly and adequately represent the Class</u>. There are no conflicts between Plaintiffs and the Class Members, and Plaintiffs bring this lawsuit out of a desire to help all Class Members, not merely out of a desire to recover their own damages.

38.     Plaintiffs' counsel are experienced class action litigators who are well-prepared to represent the interests of the Class Members.

39.     <u>A class action is superior to other available methods for the fair and efficient adjudication of this litigation</u>.

40.     Defendants are sophisticated parties with substantial resources. The individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against the Corporate Defendants.

41.     The individual members of the Class have no interest or capacity to bring separate actions; Plaintiffs are unaware of any other currently pending litigation concerning this controversy; it is desirable to concentrate the litigation in one case; and there are no likely difficulties that will arise in managing the class action.

**The Prevailing Wage Subclass**

42.     Pursuant to the New York Common Law, Plaintiffs bring their Tenth and Eleventh Causes of Action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class:

> All persons employed by Defendant Workforce7, Inc. at any time during the Class Period who worked as non-union flaggers at Con Ed job sites in New York State (the "Subclass Members").

43.     <u>The Subclass Members are readily ascertainable</u>. The number and identity of the Subclass Members are determinable from the records of Defendants. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by any means permissible under Federal Rule of Civil

Procedure.

44.     The Subclass Members are so numerous that joinder of all members is impracticable.

45.     Upon information and belief, there are in excess of forty (40) Subclass Members.

46.     Common questions of law and fact exist as to all Subclass Members and predominate over any questions solely affecting individual Subclass Members. Such common questions will determine Defendants' liability to all (or nearly all) Subclass Members. These common questions include:

    a.  whether Defendants breached contracts with Con Ed and/or state and city public entities by failing to pay Plaintiffs and the Subclass Members, who were third-party beneficiaries of such contracts, at New York State and/or New York City prevailing wage rates;

    b.  whether Defendants failed and/or refused to pay Plaintiffs and the Subclass Members supplemental benefits on prevailing wage jobs as required by the New York City and New York State prevailing wage schedules;

    c.  whether Defendants failed and/or refused to pay Plaintiffs and the Subclass Members the prevailing wage overtime premiums for work performed in excess of eight (8) hours per day and for weekend work;

    d.  whether Defendants were unjustly enriched by failing to pay Plaintiffs and the Subclass Members at prevailing wage rates on prevailing wage jobs; and

    e.  whether Defendants are liable for all damages claimed hereunder, including but not limited to compensatory damages, liquidated damages, interest, costs and disbursements and attorneys' fees.

47.     <u>Plaintiffs' claims are typical of the Subclass Members' claims</u>. Plaintiffs, like all Subclass Members, were construction flagger employees of Defendants who worked for Defendants pursuant to their corporate policies. Plaintiffs, like all Subclass Members, were, *inter alia*, not paid prevailing wages, supplemental benefits and/or daily/weekly overtime prevailing wages for work performed on New York City and New York State public streets, roadways and sidewalks. If Defendants are liable to Plaintiffs for the claims enumerated in this Complaint, they are also liable to all Subclass Members.

48.     <u>Plaintiffs and their Counsel will fairly and adequately represent the Subclass</u>. There are no conflicts between Plaintiffs and the Subclass Members, and Plaintiffs bring this lawsuit out of a desire to help all Subclass Members, not merely out of a desire to recover their own damages.

49.     Plaintiffs' counsel are experienced class action litigators who are well-prepared to represent the interests of the Subclass Members.

50.     <u>A class action is superior to other available methods for the fair and efficient adjudication of this litigation</u>.

51.     Defendants are sophisticated parties with substantial resources. The individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against the Corporate Defendants.

52.     The individual members of the Subclass have no interest or capacity to bring separate actions; Plaintiffs are unaware of any other currently pending litigation concerning this controversy; it is desirable to concentrate the litigation in one case; and there are no likely difficulties that will arise in managing the class action.

## STATEMENT OF FACTS

**Defendants' Companies**

53.     At all relevant times, Workforce7 has employed flaggers in the construction industry.

54.     According to the website for Workforce7:

Workforce 7 Inc. specializes in industries that need flaggers. As a reputable Flagging (sic) in NYC and Westchester areas, we work hard to help our clients in identifying their immediate needs and supply the right workforce for the job. We carefully screen and select our flaggers to ensure the right fit and safety for your company's needs. Our talent is fully dependable and trained for all types of traffic – at all times and weather conditions. Our expertise in all sectors gives us leverage in providing immediate talent when needed. Our leadership at WorkForce 7 Inc. ensures that each candidate is screened thoroughly and properly trained so that our clients receive the most capable talent available in the market. We work overtime to ensure that these candidates become a part of your business's growth story and act as a catalyst in its expansion.

https://www.workforce7.com/about.html.

55.     According to the public LinkedIn profile of Ronald Hilton, Defendant Hilton has served as Chief Executive Officer of Workforce7 Inc. from July 2012 through the present. *See* https://www.linkedin.com/in/ronald-hilton-a991a0155.

56.     At all relevant times, the Individual Defendant has been in charge of the day-to-day operations of Workforce7 including, among other things, hiring, disciplining and firing employees, resolving complaints and conflicts, and setting the wage rates of employees.

57.     Upon information and belief, Defendant Hilton signed Workforce7 employees' biweekly paychecks.

58.     Upon information and belief, at all relevant times, the Individual Defendant handled the operations of Workforce7's business and gave direction to the company's supervisors and managers to ensure that the work was being conducted in accordance with his policies and

procedures, including the policies complained of herein.

59.     At all relevant times, Defendant Con Ed has been in the public utilities industry, providing electric, gas and steam to New York City and Westchester County, New York.

60.     At all relevant times, Defendant Vali Industries has been in the construction contracting business. Upon information and belief, Vali Industries performed excavation work on Con Ed job sites.

61.     Upon information and belief, Defendant Vali Industries entered into contracts as a prime and/or sub-contractor with Con Ed and/or state and city public entities that required all employees working on the projects, including Plaintiffs and the Subclass Members, to be paid prevailing wages for work performed on New York City and New York State public streets, roadways and sidewalks.

62.     Plaintiffs frequently observed Defendant Hilton in the Workforce7 office, located at 4226A White Plains Road, Bronx, New York 10466, giving job assignments to Plaintiffs and Defendants' other construction flaggers, speaking on the phone with Con Ed and Vali Industries supervisors and foremen, and otherwise running the business operations of Workforce7.

63.     Upon information and belief, Defendant Hilton frequently checked in with Defendants' flaggers about issues that arose on the job sites. For example, on one (1) occasion, Hilton asked Plaintiff Ballast to explain why a flagger who had become ill was missing from a particular M. J. Electric, LLC (hereinafter "M. J. Electric") job site in upstate New York.

64.     Upon information and belief, Elijah Brown ("Brown") is a supervisor at Workforce7. Upon information and belief, the Individual Defendant is in constant contact with Brown and Defendants' other supervisors to ensure that the company is operating in accordance with his standards and policies.

**The Public Works Contracts**

65.     During the relevant time period, the Workforce7 Defendants entered into certain contracts or agreements as either a subcontractor or prime contractor, with Con Ed and Vali Industries to provide flagging work on New York City and New York State public streets, roadways and sidewalks (the "Public Works Contracts").

66.     Con Ed entered into certain Blanket Purchase Agreements ("BPAs") with Vali Industries that require a "flagperson with associated tools" to be present on all Con Ed job sites. Upon information and belief, Vali Industries contracted with Workforce7 to provide flaggers on New York City and New York State public streets, roadways and sidewalks, including on Con Ed job sites.

67.     BPAs between Con Ed and Vali Industries reference the "Con Edison Standard Terms and Conditions for Construction Contracts." The "labor" provision of those standard terms provides in pertinent part:

> Where Contractor employs workers on sites where a permit to use or open a street (including excavating the street) is required and New York City Administrative Code Section 19-142, or its successor (or a similar law, regulation, or code pertaining to sites located outside of New York City ("Similar Local Law")) is applicable, Contractor agrees that pursuant to and in furtherance of the requirements of New York City Administrative Code Section 19-142, or its successor, (or the requirements of the Similar Local Law) and the terms and conditions of the permit: none but competent workers, skilled in the work required of them, shall be employed thereon; the prevailing scale of union wages shall be the prevailing wage for similar titles as established by the Comptroller of the City of New York pursuant to Section 220 of the New York State Labor Law (or as established by such other fiscal officer, as specified in Section 220 of the New York State Labor Law, for workers on permitted sites located outside of New York City to which a Similar Local Law applies), paid to those so employed, and Contractor shall pay that prevailing wage to workers so employed.

68.     Con Ed entered into BPAs with Workforce7 in 2018 and 2020, thus evidencing contractual privity between the two parties for flagging work performed within certain territories.

69.     The Public Works Contracts obligated Defendants to pay Plaintiffs and the Subclass Members at or above the local prevailing wage rates, including any required supplemental benefits and overtime premiums for hours worked in excess of forty (40) hours per week, eight (8) hours per day, hours worked on Saturday and Sunday and hours worked during the evening.

70.     Defendants' failure to pay Plaintiffs proper prevailing wage rates, supplemental benefits and overtime premiums was a corporate policy that also applied to all of Defendants' other similarly situated employees.

71.     As employees of Defendants who were assigned to work on Defendants' gas and electrical projects, Plaintiffs and the Subclass Members were intended third-party beneficiaries of Defendants' Public Works Contracts.

72.     Upon information and belief, each project which involved street opening upon which Defendants performed work pursuant to the Public Works Contracts in New York City, required a Street Opening Permit issued by the NYC Department of Transportation (DOT). The Street Opening Permit included various stipulations for the work that was being performed, including, but not limited to, stipulations regarding the wages that were to be paid to all workers on the excavations. Specifically, the permits provided:

> WAGE01    NYC ADMINISTRATIVE CODE, 19-142, WORKERS ON
> EXCAVATIONS: A PERSON TO WHOM A PERMIT MAY BE
> ISSUED, TO USE OR OPEN A STREET, SHALL BE
> REQUIRED, BEFORE SUCH PERMIT MAY BE ISSUED, TO
> AGREE THAT NONE BUT COMPETENT WORKERS,
> SKILLED IN THE WORK REQUIRED OF THEM, SHALL BE
> EMPLOYED THEREON, (CONT. ON STIP WAGE02)
>
> WAGE02    ...AND THAT THE PREVAILING SCALE OF UNION WAGES
> SHALL BE THE PREVAILING WAGE FOR SIMILAR TITLES
> AS ESTABLISHED BY THE FISCAL OFFICER PURSUANT
> TO SEC. TWO HUNDRED TWENTY OF THE LABOR LAW,
> PAID TO THOSE SO EMPLOYED.

16

73.     As required by law, a schedule containing the prevailing rates of wages and supplemental benefits ("prevailing wage schedules") to be paid to Plaintiffs and the Subclass Members should have been annexed to and formed a part of the Public Works Contracts. If not annexed to the Public Works Contracts, these schedules were expressly or impliedly incorporated into the contracts as a matter of law and/or public policy.

74.     The promise to pay and ensure payment of the prevailing wage and supplemental benefit rate stated in the Public Works Contracts was made for the benefit of all workers furnishing labor on New York City and New York State public roadways and sidewalks, and, as such, the workers furnishing labor on New York City and New York State public roadways and sidewalks are the beneficiaries of that promise and the contracts entered into between Defendants.

75.     In furtherance of the Public Works Contracts entered into by Defendants, Plaintiffs and other members of the putative Subclass performed various flagging tasks, including but not limited to, holding stop/go signs, directing pedestrian and vehicular traffic around construction sites, placing signs around the construction site, positioning safety barriers, cones and caution tape to permit movement of construction equipment, ensuring that no pedestrians were near construction vehicles, closing street intersections and escorting construction vehicles, including backhoes, cutters, cranes and dump trucks, as they moved in and out of the construction site to ensure safe passage.

76.     Contractors that engaged the flagging services of Workforce7, including Con Ed and Vali Industries, are liable for prevailing wages owed for flagger work performed.

**Defendants' Status as Joint Employers**

77.     Throughout the relevant time period, Defendants Con Ed and Vali Industries acted as joint employers of Plaintiffs and Defendants' other construction flaggers and vigorously

supervised, directed and controlled their work.

78.     On each job site, Plaintiffs and Defendants' other flaggers worked under the sole supervision of a supervisor and/or foreman from Con Ed or Vali Industries, who assigned them to specific corners or sections of roadway, told them which streets to close, where to erect signage and directed them to walk with specific construction vehicles and machinery in and out of active construction zones.

79.     On numerous occasions, Con Ed and Vali Industries supervisors and foremen additionally instructed Plaintiffs to continue flagging while the rest of the crew took a break. For example, if Plaintiffs performed work on a two-lane street that required closure of one lane, they were required to continue holding traffic on one side while cars on the other side navigated around the site even while the other members of the Con Ed or Vali Industries construction crew were not actively working on the job site.

80.     At least one Con Ed supervisor was typically present on each Vali Industries job site on which Plaintiffs worked[1] to oversee the work that was being performed, including Plaintiffs' flagging.

81.     Upon information and belief, the flagger certification training that many of Defendants' flaggers received typically consisted of video and classroom-based instruction, such that certain Workforce7 flaggers did not have on-the-job training prior to working on Con Ed and Vali Industries job sites. Further, as mentioned below, Workforce7 typically did not send its own supervisors to the job sites to direct and control flaggers' work. Thus, Con Ed and Vali Industries

---

[1] While this Amended Complaint refers to "Vali Industries job sites" and "Con Ed job sites," as discussed within, Con Ed and Vali Industries entered into contracts to perform certain construction work on New York City and/or New York State public streets, such that a Con Ed supervisor was generally present on all Vali Industries jobs on which Plaintiffs worked. Thus, the term "Vali Industries job site" refers simply to job sites on which both Vali Industries and Con Ed workers were present, while "Con Ed job site" refers to a site on which only Con Ed workers were present.

supervisors and/or foremen frequently provided specific guidance to the flaggers as to how to perform their job duties. For example, Con Ed and Vali Industries supervisors and foremen frequently explained to Defendants' flaggers the fundamentals of directing pedestrian and vehicular traffic and how to handle civilians who gave them pushback about following their instructions. Specifically, Con Ed and Vali Industries supervisors and foremen routinely instructed Plaintiffs not to argue with pedestrians but to send them directly to the Con Ed or Vali Industries supervisor or foreman in charge of the site if there was a confrontation. On numerous occasions, the Con Ed or Vali Industries supervisor or foreman in charge of the site would immediately come over to address the issue if it appeared that a flagger was struggling with a difficult pedestrian or driver.

82.     If a pedestrian or driver had an issue with a particular flagger, they frequently demanded to speak to his or her boss, at which point Plaintiffs or Defendants' other flaggers would escalate the issue to the Con Ed or Vali Industries supervisor or foreman in charge of the site.

83.     If a pedestrian or driver entered a construction site while Plaintiffs or Defendants' other flaggers were on duty, Con Ed and Vali Industries supervisors and/or foremen would often discipline the flagger by calling Workforce7 and instructing the company not to send that particular flagger to the site moving forward. Plaintiffs additionally witnessed Con Ed and Vali Industries supervisors order flaggers off the site for this reason.

84.     Plaintiffs additionally witnessed Con Ed and Vali Industries supervisors and foremen order flaggers off job sites for various other reasons, including looking at their cell phones, wearing headphones or walking off the site for a moment without telling the Con Ed or Vali Industries supervisor on duty. Plaintiffs also witnessed certain Con Ed and Vali Industries supervisors order flaggers off the site because they had had a prior issue with a particular flagger

and did not like the way that he or she worked.

85.     Con Ed and Vali Industries supervisors and foremen routinely filled in the start and end times on flaggers' time sheets or specifically instructed flaggers what times to write down. Con Ed and/or Vali Industries supervisors or foremen additionally signed Plaintiffs' and Defendants' others flaggers' time sheets at the end of each workday.

86.     Con Ed and Vali Industries supervisors and/or foremen frequently approached Plaintiffs and Defendants' other flaggers at the end of the workday to ask for their timesheets, stating that they were required to sign them.

87.     Throughout their respective employment periods, Plaintiffs and Defendants' other flaggers were required to pick up and return carbon copy timesheets, which they retrieved from the Workforce7 office, consisting of a white top sheet, to be filled in and signed by the Con Ed or Vali Industries foreman and/or supervisor on the job site, and two underlying pink and yellow carbon copies. The company with which Plaintiffs worked on a particular day (i.e., Con Ed or Vali Industries) retained one copy, while the remaining two (2) copies went to the Workforce7 office and Plaintiffs, respectively.

88.     The timesheets contained the location of the job site, the contractor that was requesting flagging services, the flagger assigned, the name of the individual from Con Ed or Vali Industries who had requested the flagger, the time of the request and the start and end time of each job.  Workforce7 did not send flaggers to Con Ed or Vali Industries job sites until Con Ed or Vali Industries specifically requested flaggers for a particular job site.

89.     Workforce7 and, upon information and belief, Con Ed, additionally maintained certain timesheets containing, *inter alia*, the names of all of the flaggers on a particular Con Ed job site, the location of the job site and the start and end times for each flagger. Con Ed employees

signed off on these time sheets in two (2) locations – one field labeled "Checked By (Con Ed)" and another labeled "Approved for Con Edison." A field on the sheets labeled "scope of work performed this date" indicated that Con Ed had requested Plaintiffs for "flagging" and "flag[ging] to traffic flow & traffic safety."

90.     Plaintiffs are aware that Vali Industries maintained a white attendance sheet posted on a board on Vali Industries job sites on which Defendants' flaggers and the Vali Industries crew signed their names so that Vali Industries would know which workers, including flaggers, were on the site on a particular day.

91.     Con Ed and Vali Industries supervisors and foremen routinely informed the Workforce7 Defendants which employees they did and did not want to work on specific job sites or with a specific crew, thereby making personnel decisions. Various Con Ed and Vali Industries supervisors and foremen frequently approached Plaintiffs and Defendants' other flaggers to personally inform them that they liked the way they worked and wanted them to return to work on the same job site or with the same crew the following day. On certain occasions, the Con Ed or Vali Industries supervisor who had initially approached the flagger would inform him or her that they (i.e., the Con Ed or Vali Industries supervisor) had called Workforce7 to specifically request him or her. On several occasions, Plaintiffs additionally heard other flaggers mention that they had been specifically requested by Con Ed or Vali Industries to work with a specific crew.

92.     On numerous occasions throughout Plaintiffs' respective employment periods, Con Ed and Vali Industries supervisors and foremen sent Plaintiffs out to a second Con Ed or Vali Industries job site during their workday. When this occurred, Con Ed or Vali Industries supervisors would typically call Workforce7 to let the company know that the Con Ed or Vali Industries crew was relocating to another job site and that they intended to keep a particular Workforce7 flagger

on the job. For example, Plaintiff Richardson recalls that when he performed work with Vali Industries, the Vali Industries supervisor would often instruct him to report to up to three (3) different locations in one day.

93.     Occasionally, Con Ed and Vali Industries ordered Plaintiffs and Defendants' other flaggers to perform work with an entirely different Con Ed or Vali Industries crew during their workday. For example, on occasion, Con Ed or Vali Industries supervisors and/or foremen would decide that they only needed one (1) flagger on a particular job site instead of the two (2) that they had initially requested and would send the second flagger to work with another Con Ed or Vali Industries crew.

94.     Con Ed supervisors occasionally instructed Plaintiffs and Defendants' other flaggers to report to specific Con Ed yards to wait for further job assignments from Con Ed.

95.     On numerous occasions throughout the relevant time period, Workforce7 additionally instructed Plaintiffs and Defendants' other flaggers to report to a Con Ed yard in New York City or elsewhere in the State of New York to wait to be assigned a job from a Con Ed supervisor and/or foreman.

96.     On numerous occasions, Con Ed supervisors and/or foremen instructed Plaintiffs and Defendants' other flaggers to remain on specific job sites until the next Con Ed crew arrived on the site. When this occurred, Plaintiffs would have to continue flagging on the site for as many as four to five (4-5) hours until the next crew arrived.

97.     Throughout Plaintiffs' respective employment periods, Con Ed and Vali Industries supervisors and foremen instructed them when to take a break and when to leave at the end of the workday. Plaintiffs were additionally required to obtain permission from Con Ed or Vali Industries supervisors or foremen before using the restroom, taking a break or otherwise leaving the site.

98.     Throughout the relevant time period, Workforce7 did not send supervisors to Con Ed or Vali Industries job sites to direct and control Plaintiffs' work. Although Workforce7 supervisors occasionally visited job sites to bring certain equipment, they did not remain at the job sites for a significant period of time and did not direct and control flaggers' work. Thus, Plaintiffs were solely supervised by Con Ed or Vali Industries supervisors and foremen and were required to follow the instructions of the company running each particular job site in order to continue working on Con Ed and Vali Industries job sites.

99.     An April 2018 Con Ed document titled "Field Support Services Termsheets" (including a "Flagging Services Termsheet") outlines basic requirements for use of signage, parking and flagging services and imposes numerous requirements on flaggers working on Con Ed job sites. For example, the "Flagging Services Termsheet" states that flaggers must wear or carry specific gear and equipment on Con Ed job sites, check into the designated work location fifteen (15) minutes prior to the start of the work assignment, have their timesheet signed by a Con Ed representative and take a thirty (30) minute break during the workday. The "Flagging Services Termsheet" additionally states that flaggers on Con Ed job sites are required to wear DOT-approved hard hats that are not white or "Con Edison blue," steel-toed safety shoes, DOT-approved safety vests.

100.    Con Ed's "Flagging Services Termsheet" additionally demonstrates that Con Ed requires flagger vendors to supply a comprehensive "Data Package" on the final business day of each month, as well as every week, containing a specified set of data points, including names of flaggers on Con Ed sites, the number of flaggers used, start and end times and the total amount to be paid to the vendor.

101.    Upon information and belief, Workforce7 was required to send detailed

spreadsheets to Con Ed, per Con Ed's specific instructions, specifying, *inter alia*, the date of service, invoice number, Con Ed ticket number, the name of the requestor, the supervisor on duty, the job location, the name of the flagger, whether the flagger's time sheet was received, start and end times, the number of regular and overtime hours worked, whether a thirty (30)-minute break was taken and the total invoice amount. Upon information and belief, Workforce7 had to send these spreadsheets on a routine basis to a specific Con Ed contact. As mentioned above, Con Ed additionally maintained copies of flaggers' timesheets.

102.    Throughout their respective employment periods, Plaintiffs used equipment and materials provided by Con Ed on the job sites, including yellow caution tape to close the streets, cones and orange waving flags. Con Ed and Vali Industries additionally provided certain signs, including "Flagger Ahead" and "Road Closed" signs, which Plaintiffs typically put out and took down each day. Certain Plaintiffs were also given a fluorescent Con Ed jacket to wear when performing work on Con Ed job sites in the rain.

103.    When Plaintiffs performed additional laborer work, such as sweeping, shoveling or cleaning up around the job sites, Plaintiffs routinely used shovels and brooms provided by Con Ed and/or Vali Industries.

104.    Throughout the relevant time period, Con Ed and Vali Industries supervisors and foremen recorded any issues with a flagger's job performance.

105.    As joint employers, Con Ed and Vali Industries are responsible, along with the Workforce7 Defendants, for compliance with all applicable provisions of the FLSA.

**Plaintiffs' Work for Defendants**

106.    Plaintiff Ballast worked for Defendants as a construction flagger from in or around February 2019 through in or around April 2019 (the "Ballast Employment Period").

24

107.     Throughout the Ballast Employment Period, Plaintiff Ballast performed flagging work on public streets, roadways and sidewalks throughout Westchester County, the Bronx, Queens and Brooklyn. As discussed in greater detail below, Plaintiff Ballast additionally worked as a construction flagger on several job sites in and around Schenectady, New York with M. J. Electric.

108.     During the Ballast Employment Period, Plaintiff Ballast performed work on Con Ed job sites on at least ten (10) occasions, including job sites located at 5 Gates Avenue in Ossining, New York, 132nd Street and Broadway in Manhattan, 11th Avenue between West 48th Street and West 49th Street in Manhattan, 43rd Avenue and 248th Street in Queens, 32-02 Queens Boulevard in Queens, 36th Avenue and Vernon Boulevard in Manhattan, 201 Ashland Place between Dekalb Avenue and Fulton Street in Brooklyn and 117th Street and 14th Avenue in Queens. As mentioned above, when Ballast performed work on a Con Ed job site, he was exclusively supervised by Con Ed supervisors, who instructed him where to stand, which streets to close, where to erect signage, which construction vehicles to direct in and out of the construction sites, when to take a break and what start and end times to fill out on his time sheet. These Con Ed supervisors additionally signed Ballast's time sheet at the end of the work day and retained a copy. Workforce7 did not send its own supervisors to Con Ed job sites to direct or control Ballast's work.

109.     Plaintiff Ballast performed work for Vali Industries on at least thirteen (13) occasions, including at job sites located at 36th Street between 4th Avenue and 5th Avenue in Manhattan, Atlantic Avenue between Washington Avenue and St. James Place in Brooklyn, East 20th Street between 2nd Avenue and 3rd Avenue in Manhattan, Van Wyck Expressway and Jamaica Avenue in Queens, 19th Avenue between 85th Street and 86th Street in Brooklyn, Stillwell Avenue between Mermaid Avenue and Neptune Avenue in Brooklyn, 2nd Avenue between 51st Street and

52nd Street in Brooklyn, East 29th Street between 1st Avenue and 2nd Avenue in Manhattan, Harway Avenue and Bay 38th Street in Brooklyn, West Houston Street and Greene Street in Manhattan, 153rd Street between Jamaica Avenue and Archer Avenue in Queens, 126th Street and Union Turnpike in Queens, Metropolitan Avenue and Interboro Parkway in Queens, Jamaica Avenue and 98th Street in Queens, West 14th Street between 7th Avenue and 8th Avenue in Manhattan, 2nd Avenue between 9th Street and 10th Street in Manhattan, Hinsdale Avenue between Pitkin Avenue and Belmont Avenue in Brooklyn and 121st Avenue and 233rd Street in Queens.

110.    On several occasions throughout the Ballast Employment Period, Con Ed and Vali Industries supervisors and/or foremen sent Ballast out to a second Con Ed or Vali Industries job site during his workday. When Plaintiff Ballast was required to report to another Con Ed or Vali Industries job site, he was not paid for time spent traveling between the first and second job sites. Instead, Plaintiff Ballast only received compensation for time spent working on the job sites.

111.    Although Plaintiff Ballast does not personally recall being sent to a Con Ed yard while he worked for Workforce7, he is aware, based on his observations of the Workforce7 office and conversations with coworkers, that Workforce7 would often send a certain number of flaggers to stand by the gate of Con Ed yards located in Yonkers, Harrison, Rye, Valhalla, Parkchester and New Rochelle, to wait for Con Ed to assign them to work with a Con Ed crew.

112.    Plaintiff Ballast was hired by Defendant Hilton, who instructed him when to arrive at the Workforce7 office in the morning and told him what his pay rate would be. At the time Ballast was hired, Defendant Hilton instructed him to assemble a team of construction flaggers to work on public streets in upstate New York. Plaintiff Ballast additionally frequently received job assignments from Defendant Hilton, including several jobs that Ballast performed in and around Schenectady, New York for M. J. Electric and National Grid, discussed in greater detail below.

113.   Throughout the Ballast Employment Period, Plaintiff Ballast typically worked at least five to six (5-6) days per week, approximately six (6) to thirteen and one-half (13.5) hours per day, depending on the specific job site to which he was assigned, for a total of approximately forty to six (40-60) hours per week on Con Ed and Vali Industries job sites, and frequently more, not including travel time or time spent in the Workforce7 office.

114.   Upon information and belief, in or around May 2016, M. J. Electric contracted with National Grid to pull high-tension wires on multiple job sites in upstate New York (the "M. J. Electric Projects"). On several occasions in or around winter and spring 2019, Plaintiff Ballast performed work on several M. J. Electric and/or National Grid job sites in and around Schenectady, New York under the direction, supervision and control of M. J. Electric supervisors. Plaintiff Ballast performed work on the M. J. Electric Projects on approximately fifteen (15) occasions.

115.   During the period that Plaintiff Ballast worked on the M. J. Electric Projects, he typically worked six to ten (6-10) hours per day on the job sites.

116.   Throughout the Ballast Employment Period, excepting the time that he spent working on the M. J. Electric Projects, Plaintiff Ballast typically spent approximately two (2) hours per day driving his personal vehicle from the Workforce7 office to the job site to which he was assigned and back again at the end of the day to return his time sheet. Plaintiff Ballast was also occasionally required to travel to more than one job site during the same workday. Plaintiff Ballast was not paid wages of any kind for time spent traveling between the Workforce7 office and job sites or time spent traveling between multiple job sites.

117.   For his work, Plaintiff Ballast was paid fifteen dollars ($15.00) per hour for all "regular" hours for which he received compensation, and twenty-two dollars and fifty cents ($22.50) for all overtime hours for which he was compensated. Ballast did not receive wages of

27

any kind for time spent waiting for job assignments, picking up and returning time sheets and equipment, traveling between job sites, and traveling between the Workforce7 office and the job sites.

118.   For his work on the M. J. Electric Projects, Plaintiff Ballast was paid twenty-one dollars ($21.00) per hour for all "regular" hours for which he received compensation and thirty-one dollars and fifty cents ($31.50) for all "overtime" hours for which he received compensation. When Plaintiff Ballast performed work on the M. J. Electric Projects, he did not receive wages of any kind for travel time or time spent waiting to be assigned a job.

119.   Throughout the Ballast Employment Period, Plaintiff Ballast did not receive benefits of any kind.

120.   Plaintiff Simone worked for Defendants from in or around February 2019 through in or around April 2019 (the "Simone Employment Period").

121.   Throughout the Simone Employment Period, Plaintiff Simone performed flagging work for Defendants on public streets, roadways and sidewalks throughout the Bronx, Manhattan, Brooklyn, Queens and Westchester County.

122.   On several occasions in or around winter and spring 2019, Plaintiff Simone performed work on the M. J. Electric Projects under the direction, supervision and control of M. J. Electric supervisors. In total, Plaintiff Simone worked on the M. J. Electric Projects on approximately fifteen (15) occasions.

123.   Plaintiff Simone performed work on Con Ed job sites on approximately ten (10) occasions, including job sites located at 5 Gates Avenue in Ossining, New York, West 132nd Street and Broadway in Manhattan, 35th Avenue between 82nd Street and 83rd Street in Queens, Jay Street and Johnson Street in Brooklyn and Vernon Boulevard and 9th Avenue in Queens. As mentioned

above, when Simone performed work on a Con Ed job site, he was exclusively supervised by Con Ed supervisors, who instructed him where to stand, which streets to close, where to erect signage, which construction vehicles to direct in and out of the construction sites, when to take a break and what start and end times to fill out on his time sheet. These Con Ed supervisors additionally signed Simone's time sheet at the end of the work day and retained a copy. Workforce7 did not send its own supervisors to Con Ed job sites to direct or control Simone's work.

124.    Plaintiff Simone performed work for Vali Industries on at least fifteen (15) occasions, including at job sites located at Newtown Avenue between 23rd Street and Crescent Street in Queens, 3rd Avenue between 31st Street and 32nd Street in Manhattan, 2nd Avenue and East 13th Street in Manhattan, Lexington Avenue between East 53rd Street and East 54th Street in Manhattan, 2nd Avenue between East 9th Street and East 10th Street in Manhattan, 2nd Avenue and East 8th Street in Manhattan, 1st Avenue and East 61st Street in Manhattan, 1st Avenue between East 9th Street and East 10th Street in Manhattan, Delancey Street between Ridge Street and Pitt Street in Manhattan, Concord Street between Jay Street and Bridge Plaza in Brooklyn, 1st Avenue between 9th Street and St. Marks Place in Manhattan, East 65th Street between Park Avenue and Lexington Avenue in Manhattan, West 79th Street and West End Avenue in Manhattan and Delancey Street and Essex Street in Manhattan.

125.    Throughout the Simone Employment Period, Plaintiff Simone typically worked between six (6) and fourteen (14) hours per day, five to six (5-6) days per week, for a total of at least forty to fifty-two (40-52) hours per week on Defendants' job sites, and frequently more, not including travel time or time spent in the Workforce7 office.

126.    During the period that Plaintiff Simone worked on the M. J. Electric Projects, he typically worked five to six to nine and one-half (6-9.5), and sometimes up to eleven (11), hours

per day on the job sites.

127.   Plaintiff Simone was hired by Defendant Hilton, who instructed him when to arrive at the Workforce7 office in the morning and told him what his pay rate would be. Plaintiff Simone additionally frequently received job assignments from Defendant Hilton. On one (1) occasion, Plaintiff Simone paid Defendant Hilton one hundred dollars ($100.00) to administer a test to renew his flagging license, which he took in the Workforce7 office.

128.   Throughout the Simone Employment Period, Plaintiff Simone typically spent approximately fifteen to forty-five (15-45) minutes driving his personal vehicle from the Workforce7 office to the job site to which he was assigned, plus another fifteen to forty-five (15-45) minutes back to the Workforce7 office at the end of the day to return his time sheet. Plaintiff Simone was not paid wages of any kind for time spent traveling between the Workforce7 office and job sites.

129.   For his work, Plaintiff Simone was paid fifteen dollars ($15.00) per hour for all "regular" hours for which he received compensation and twenty-two dollars and fifty cents ($22.50) for all overtime hours for which he received compensation. Plaintiff Simone was compensated only for time worked on the job sites and did not receive wages of any kind for time spent waiting for job assignments, picking up and returning, time sheets and equipment and traveling between the Workforce7 office and the job sites.

130.   For his work on the M. J. Electric Projects, Plaintiff Simone was paid twenty-one dollars ($21.00) per hour for all "regular" hours for which he received compensation. When Plaintiff Simone performed work on the M. J. Electric Projects, he did not receive wages of any kind for travel time or time spent waiting to be assigned a job.

131.   Throughout the Simone Employment Period, Plaintiff Simone did not receive

benefits of any kind.

132.    Plaintiff Richardson worked for Defendants from on or about February 9, 2019 to

on or about November 20, 2019 (the "Richardson Employment Period"). Throughout the

Richardson Employment Period, Plaintiff Richardson was assigned to Workforce7's emergency

unit, such that he could be sent out to work at virtually any time.

133.    Throughout the Richardson Employment Period, Plaintiff Richardson performed

flagging work for Defendants on public streets, roadways and sidewalks throughout Westchester,

Manhattan, Brooklyn and Queens. Plaintiff Richardson additionally worked as a construction

flagger on the M. J. Electric Projects.

134.    When Plaintiff Richardson performed work on Con Ed job sites, he typically

worked at various job sites throughout Westchester County and Manhattan. When Richardson

worked with Vali Industries, he typically performed work throughout Brooklyn and Queens, and

sometimes Manhattan.

135.    Throughout the Richardson Employment Period, Plaintiff Richardson typically

worked five to six (5-6) days per week, between seven (7) and twenty-four (24) hours per day,

depending on the particular job sites to which he was assigned, for a total of approximately forty

to sixty (40-60) hours per week on job sites for Defendants, not including travel time or time spent

in the Workforce7 office.

136.    Plaintiff Richardson estimates that approximately eighty percent (80%) of the work

that he performed during the Richardson Employment Period was on Con Ed job sites. When

Richardson performed work on a Con Ed job site, he was exclusively supervised by Con Ed

supervisors, who instructed him where to stand, which streets to close, where to erect signage,

which construction vehicles to direct in and out of the construction sites, when to take a break and

what start and end times to fill out on his time sheet. These Con Ed supervisors additionally signed Richardson's time sheet at the end of the work day and retained a copy. Workforce7 did not send its own supervisors to Con Ed job sites to direct or control Richardson's work.

137.   On numerous occasions throughout the Richardson Employment Period, Con Ed supervisors or foremen sent Richardson out to a second Con Ed job site during the same workday. Plaintiff Richardson estimates that approximately fifty percent (50%) of the time that he worked on Con Ed job sites, a Con Ed supervisor or foreman directed him to report to another Con Ed job site during his workday. Similarly, Plaintiff Richardson recalls that when he performed work with Vali Industries, the Vali Industries supervisor would often instruct him to report to three (3) different locations in one day.

138.   When Plaintiff Richardson was required to report to another Con Ed or Vali Industries job site during his workday, he was not paid wages of any kind for time spent traveling between the first and second job sites. Instead, Plaintiff Richardson only received compensation for time spent working on the job sites.

139.   On approximately fifteen (15) occasions, Workforce7 instructed Plaintiff Richardson to report to a Con Ed yard in New York City or elsewhere in New York State to wait to be assigned job from a Con Ed supervisor and/or foreman. On these occasions, Plaintiff Richardson would stand outside of the Con Ed yard to which he had been instructed to report and wait for a Con Ed employee to assign him to a crew. Specifically, Plaintiff Richardson recalls reporting to Con Ed yards located in the Parkchester neighborhood of the Bronx and Fishkill, New York.

140.   As discussed in greater detail below, Plaintiffs and Defendants' other flaggers were required to report to the Workforce7 office in order to indicate their availability to work, pick up

a timesheet and receive job assignments. On several occasions toward the beginning of the Richardson Employment Period, Plaintiff Richardson was required to wait at the Workforce7 office from approximately 5:00 am to 10:00 am for a job assignment, only to be informed that there was no work available that day. When this occurred, Plaintiff Richardson did not receive wages of any kind for the time that he spent waiting for a job.

141.    For his work, Plaintiff Richardson was paid fifteen dollars ($15.00) per hour for all "regular" hours for which he received compensation and twenty-two dollars and fifty cents ($22.50) for all overtime hours for which he received compensation.

142.    On several occasions in or around winter and spring 2019, Plaintiff Richardson performed work on the M. J. Electric Projects under the direction, supervision and control of M. J. Electric supervisors. In total, Plaintiff Richardson worked on the M. J. Electric Projects for a total of approximately one (1) month. When Plaintiff Richardson performed work on the M. J. Electric Projects, he did not receive wages of any kind for travel time or time spent waiting to be assigned a job.

143.    Throughout the Richardson Employment Period, Plaintiff Richardson typically spent at least one (1) hour per day, and frequently more, driving his personal vehicle between the Workforce7 office and the job site to which he was assigned. Plaintiff Richardson was not paid wages of any kind for time spent traveling between the Workforce7 office and job sites.

144.    Throughout the Richardson Employment Period, Plaintiff Richardson did not receive benefits of any kind.

145.    Throughout their respective employment periods, Plaintiffs were required to arrive at the Workforce7 office, located at 4226A White Plains Road, Bronx, New York 10466, at 6:00 am, as they were instructed by Defendant Hilton, and sometimes earlier, in order to be assigned a

job. Plaintiffs recall that the work was typically doled out on a first-come, first-serve basis and that if an individual's name was at the bottom of the list, he or she likely would not be assigned work on that particular day. Thus, there was an incentive to arrive by at least 6:00 am each day.

146.   Upon arrival, Plaintiffs were required to sign in with the office to indicate their availability to work. They were then required to wait approximately one to one and one-half (1-1.5) hours for a job assignment. Once they were assigned a job, they returned upstairs to the office to retrieve a timesheet containing fields for the job location at which they worked, the company for which they worked, time in and time out, to be signed by a Con Ed or Vali Industries supervisor or foreman, depending on the job site. On several occasions, Plaintiffs were additionally required to pick up extra cones and signs to bring to the job sites.

147.   Plaintiff Richardson is aware that a former coworker who lives in Westchester frequently had discussions with a Workforce7 receptionist about having to come into the Bronx office each day, as it was his belief that Defendants could have simply assigned him to jobs in Westchester and allowed him to leave from his home. After numerous complaints of this nature, Defendants simply stopped assigning jobs to Richardson's coworker, presumably due to his reluctance to come to the Workforce7 office each morning.

148.   As mentioned above, on occasion, Defendants' flaggers were required to wait at the Workforce7 office for substantial periods of time without being assigned a job. Plaintiffs are aware that certain individuals could be required to wait for the entirety of their normal workday (i.e., as late as 3:00 pm) only to be informed that there was no work available that day. When this occurred, Defendants' flaggers were not paid for the time spent waiting for jobs, despite the fact that they had appeared for work. Thus, they did not receive required call-in pay of at least four (4) hours, or the number of hours in their regularly scheduled shift, whichever was less, from the

Workforce7 Defendants.

149.    Throughout their respective employment periods, Plaintiffs were paid via a payroll check, which they received on a biweekly basis from Workforce7 office employees.

150.    As manual workers, Plaintiffs and Defendants' other construction flaggers were entitled to be paid on a weekly basis, no later than seven (7) days after the end of each workweek. Thus, Plaintiffs and Defendants' other construction flaggers are entitled to damages for unreasonably delayed payment of wages.

151.    Plaintiffs and Defendants' other construction flaggers were required to return their completed time sheets to the Workforce7 office, located at 4226A White Plains Road, Bronx, New York 10466, at the end of each workday. Plaintiffs are aware, based on discussions with coworkers and their observations of the Workforce7 office that if a flagger did not return his or her timesheet to the Workforce7 office, he or she would be penalized by not being assigned jobs.

152.    Plaintiffs also recall that Workforce7 office employees would repeatedly call them to ensure that they brought back their timesheets to the Workforce7 office at the end of the day. It is Plaintiffs' understanding that Workforce7 was insistent that they and Defendants' other flaggers return their timesheets in a timely manner because Workforce7 would not be able to charge Con Ed and Vali Industries for flagging services without data from the timesheets reflecting how many hours they had worked on Con Ed and Vali Industries job sites.

153.    Plaintiff Ballast is in possession of a Workforce7 "Safety Violation Notice (Employee Safety Violation/Warning)" dated April 2, 2019 that states that Ballast "continuously bring[s] sign out sheets late." Under a section titled "Required Corrective Action," it states that "flagger will be more responsible in returning sign out sheets to the office."

154.    Plaintiffs are aware based on discussions with coworkers that Defendants

automatically deducted thirty (30) minutes, and possibly up to one (1) hour, for a lunch break, from certain flaggers' payments even though they were not always able to take a break during the workday if there was no one to replace them on the job site and thus, they could not get permission from the Con Ed or Vali Industries supervisor on duty.

155.    Throughout their respective employment periods, Plaintiffs were not paid wages of any kind for the time spent waiting for job assignments, picking up and returning mandatory time sheets and equipment, traveling between the Workforce7 office and the job sites and traveling between multiple job sites in the same workday.

156.    Although Plaintiffs frequently worked a spread of more than ten (10) hours per day or split shifts, they did not receive spread-of-hours premiums equal to an additional hour at the applicable minimum wage for such days.

157.    Plaintiffs did not receive a proper wage notice when they were hired and/or before a change of pay rate, as required by the NYLL, from Defendants at any point during the Relevant Time Period.

158.    Because Plaintiffs' paystubs only accounted for time worked on job sites and did not include time spent waiting for job assignments, picking up and dropping off necessary paperwork and equipment, and traveling to, from and between job sites, the wage statements that Plaintiffs received did not show an accurate accounting of all hours that he had worked during the workweek.

159.    Upon information and belief, Workforce7 employs a total of at least eighty (80) construction flaggers at any given time. Plaintiffs routinely observed a large number of flaggers in and around the Workforce7 office each day while waiting for job assignments.

160.    Upon information and belief, in order to perform work for Defendants, Plaintiffs

were required to hold flagger certification cards.

161.    Throughout the relevant time period, all of Defendants' flaggers were required to take a flagger safety course and wear safety gear, including a hard hat, vest, steel-toed boots, gloves, goggles, and occasionally a dust mask, on job sites.

162.    Throughout the relevant time period, Plaintiffs and Defendants' other construction flaggers performed a variety of tasks, including but not limited to, holding stop/go signs, directing pedestrian and vehicular traffic around construction sites, placing signs around the construction site, positioning safety barriers, cones and caution tape to permit movement of construction equipment, ensuring that no pedestrians were near construction vehicles, closing street intersections and escorting construction vehicles, including backhoes, cutters, cranes and dump trucks, as they moved in and out of the construction site to ensure safe passage.

163.    At all relevant times, Plaintiffs and Defendants' other construction flaggers performed their work in and around the zone of construction, in close proximity to construction zones and pedestrian and vehicular traffic.

164.    Regardless of which job site they worked on, Plaintiffs' and Defendants' other flaggers' job duties on the construction site remained consistent.

165.    In addition to their flagging duties, Plaintiffs and Defendants' other construction flaggers were also required to perform certain other tasks, including sweeping and cleaning up around the job site, taking tools back to trucks and taking down cones and barricades.

**The M. J. Electric Projects**

166.    During the periods that Plaintiffs worked on the M. J. Electric Projects, M. J. Electric supervisors gave Plaintiffs and Defendants' other construction flaggers instructions about where to stand, which streets to close and where to place signs around the job sites. Upon

information and belief, approximately nine (9) flaggers affiliated with Workforce7 worked on the M. J. Electric Projects at any given time.

167.    The M. J. Electric Projects did not relate to and were not overseen by Con Ed personnel such that Con Ed is not liable for wage damages Plaintiffs incurred while performing work on the M. J. Electric Projects.

168.    On days that Plaintiffs and Defendants' other flaggers traveled to work on the M. J. Electric Projects, they were required to meet at the Workforce7 office, then drive their personal vehicles to an Enterprise Rent-a-Car in New Jersey to pick up six to seven (6-7) pickup trucks that Workforce7 had rented and load various equipment and signs. Plaintiffs each drove a rented pickup truck on the M. J. Electric Projects.

169.    Upon information and belief, there were approximately six to seven (6-7) different job sites to which Plaintiffs and Defendants' other construction flaggers could be assigned on the M. J. Electric Projects.

170.    Although Plaintiffs observed Elijah Brown, a Workforce7 supervisor, driving around to the different job sites comprising the M. J. Electric Projects, Brown generally did not interact with or instruct the construction flaggers on the site, such that they were exclusively supervised by M. J. Electric workers.

171.    Defendant Hilton accompanied Plaintiffs and Defendants' other flaggers to Schenectady during their first trip in or around February 2019 to introduce the flaggers and provide M. J. Electric supervisors with their names.

172.    At approximately two to three (2-3) locations on the M. J. Electric Projects, M. J. Electric set up portable cranes and wire braces to protect against falling wires, which were, at times, positioned in roadways. On these occasions, Plaintiffs were required to remain on the job

site until an M. J. Electric worker was able to move the crane out of the road.

173.    On the M. J. Electric Projects, Plaintiffs and Defendants' other construction flaggers were required to arrive at an industrial park located at 695 Rotterdam Corporate Park, Schenectady, New York 12306 at approximately 5:50 am to wait for a job assignment from an M. J. Electric supervisor. The M. J. Electric supervisor typically arrived at the industrial park at around 6:00 am.

174.    Plaintiffs are in possession of certain Workforce7 work "vouchers" containing a list of the flaggers assigned on the various M. J. Electric Project job sites, as well as the "request time" and finish time for each workday. Despite the fact that Plaintiffs were required to report to the industrial park before 6:00 am, the "request time" was routinely listed as 7:00 am.

175.    At the industrial park in the morning, the M. J. Electric supervisor typically instructed Plaintiffs and Defendants' other construction flaggers to check off their names to indicate their availability to work. There were no fields on the paperwork to indicate the time that they arrived at the industrial park.

176.    When Plaintiffs performed work on the M. J. Electric Projects, they and Defendants' other construction flaggers were required to wait approximately forty-five to sixty (45-60) minutes to receive a job assignment from an M. J. Electric supervisor. They did not receive wages of any kind for time spent waiting for a job assignment.

177.    Similarly, Plaintiffs and Defendants' other construction flaggers were not required to sign out at the end of the day, but were simply told when to stop working by an M. J. Electric supervisor on the job site. Thus, Plaintiffs and Defendants' other construction flaggers were not required to return any paperwork to Workforce7 at the end of the workday regarding the specific hours that they worked. Upon information and belief, this information was conveyed to

Workforce7 managers and/or supervisors by M. J. Electric foremen and/or supervisors.

178.    At the end of the workday on the M. J. Electric Projects, Plaintiffs were permitted to drive back to their hotel and were not required to return paperwork or meet with Workforce7 supervisors.

179.    Occasionally, when Plaintiffs and Defendants' other construction flaggers arrived at the industrial park to receive a job assignment from an M. J. Electric supervisor, they were informed that the job was cancelled. When this occurred, they and Defendants' other construction flaggers would be paid for six (6) hours at their hourly rate of twenty-one dollars ($21.00) per hour.

180.    During the time that Plaintiffs performed work on the Schenectady Projects, they typically spent approximately ten to twenty (10-20) minutes traveling back and forth between the job sites and the industrial park. As mentioned above, they did not receive wages of any kind for travel time.

181.    During the period that Plaintiffs performed work on the Schenectady Projects, they were given twenty dollars ($20.00) each day for meals from Brown. Although they were required to sign a sheet of paper either in the hotel or the industrial park to receive the money, there was no place on the sheet to indicate the time at which they signed.

**Defendants' Corporate Policies**

182.    Defendants' failure to pay minimum wages for all hours worked, wages of any kind for time spent at the Workforce7 office (and, with respect to the Workforce7 Defendants only, the Schenectady industrial park) waiting for job assignments and picking up and dropping off necessary paperwork and equipment and traveling to, from and between job sites, overtime premiums of one and one-half (1.5) times the regular hourly rate for all hours worked in excess of

forty (40) per week and spread-of-hours premiums for split shifts or hours worked in excess of ten (10) hours in a day, was a corporate policy that applied to all construction flaggers employed by Defendants. The Workforce7 Defendants' failure to provide call-in pay of four (4) hours or the number of hours in a scheduled shift, was a corporate policy of the Workforce7 Defendants that applies to all of Defendants' flaggers.

183.     Upon information and belief, during the period of time for which Plaintiffs and the members of the putative Class performed work on New York City and New York State public streets, roadways and sidewalks, Defendants failed to ensure payment of the correct prevailing rate of wages and supplemental benefits, including overtime pay, to which Plaintiffs and other members of the putative Class were entitled.

184.     Defendants' failure to pay Plaintiffs prevailing wages and supplemental benefits for work performed on New York City and New York State public street, roadways and sidewalks was a corporate policy that applied to all of Defendants' construction flaggers throughout the relevant period.

185.     Defendants failed to provide Plaintiffs and their other employees with proper wage notices at the time of hire or before a change of pay rate or proper wage statement(s) with every payment of wages or accurate wage statements pursuant to the NYLL.

**FIRST CAUSE OF ACTION**
**FAIR LABOR STANDARDS ACT – UNPAID MINIMUM WAGE**
**(Brought on Behalf of Plaintiffs and the Collective Action Members)**

186.     Plaintiffs, on behalf of themselves and the Collective Action Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

187.    By failing to pay minimum wage for all hours worked, Defendants have violated and continue to violate the FLSA, 29 U.S.C. §§ 201 et seq., including 29 U.S.C. §§ 206 and 215(a)(2).

188.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

189.    Defendants' failure to pay minimum wages for all hours worked caused Plaintiffs and the Collective Action Members to suffer loss of wages and interest thereon. Therefore, Plaintiffs and the Collective Action Members are entitled to recover from Defendants their full unpaid minimum wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

**SECOND CAUSE OF ACTION**
**FAIR LABOR STANDARDS ACT – UNPAID OVERTIME**
**(Brought on Behalf of Plaintiffs and the Collective Action Members)**

190.    Plaintiffs, on behalf of themselves and the Collective Action Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

191.    Defendants violated the FLSA overtime rights of Plaintiffs and the Collective Action Members by failing to pay overtime premiums of one and one-half (1.5) times the employees' regular hourly rates for all hours worked in excess of forty (40) hours per week.

192.    By failing to pay overtime at a rate not less than one and one-half times the regular rate of pay for work performed in excess of 40 hours per week, Defendants have violated and continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 207(a)(1) and 215(a)(2).

193.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

194.    Defendants' failure to pay overtime caused Plaintiffs and the Collective Action Members to suffer loss of wages and interest thereon. Plaintiffs and the Collective Action Members are entitled to recover from Defendants their unpaid overtime premium compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

**THIRD CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNPAID MINIMUM WAGE**
**(Brought on Behalf of Plaintiffs and the Class Members)**

195.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

196.    Defendants willfully violated Plaintiffs' and Class Members' rights by failing to pay minimum wage for all hours worked, in violation of the NYLL and regulations promulgated thereunder.

197.    Defendants' failure to pay minimum wage for all hours worked caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon. Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid minimum wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

**FOURTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNPAID OVERTIME**
**(Brought on Behalf of Plaintiffs and the Class Members)**

198.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

199.    Defendants violated the NYLL overtime rights of the Plaintiff and the Class Members by improperly treating them as exempt from the NYLL when they performed non-exempt duties and failing to pay overtime premiums consisting of one and one-half (1.5) times employees' regular hourly rates for all hours worked in excess of forty (40) hours per week.

200.    Defendants willfully violated Plaintiffs and the Class Members' rights by failing to pay overtime compensation at a rate of not less than one and one-half times the regular rate of pay for hours worked in excess of forty (40) each week, in violation of the NYLL and regulations promulgated thereunder.

201.    Defendants' failure to pay overtime premium compensation caused Plaintiff and the Class Members to suffer loss of wages and interest thereon. Plaintiff and the Class Members are entitled to recover from Defendants their unpaid overtime compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

**FIFTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNPAID SPREAD-OF-HOURS**
**(Brought on Behalf of Plaintiffs and the Class Members)**

202.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

203.     Defendants willfully violated Plaintiffs' and the Class Members' rights by failing to pay compensation in an amount equal to one hour's pay at the relevant minimum wage in all instances where the Class Members worked either a split shift or more than 10 hours per day, in violation of the NYLL §§ 650, *et seq*., and the regulations promulgated thereunder including N.Y. Comp. Code R. & Regs. tit. 12, §§ 137-1.7 (2010), 146-1.6 (2012).

204.     Defendants' failure to pay spread-of-hours compensation caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon. Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid spread-of-hours compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq*.

**SIXTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – FAILURE TO PAY WAGES**
**(Brought on Behalf of Plaintiff and the Class Members)**

205.     Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

206.     Pursuant to NYLL § 191 and the cases interpreting same, workers such as Plaintiffs and the Class Members are entitled to be paid all their weekly wages "not later than seven calendar days after the end of the week in which wages are earned." Thus, Defendants violated NYLL § 191 by failing to pay Plaintiff all of their wages earned within the week such wages were due.

207.     Pursuant to NYLL § 193, "No employer shall make any deduction from the wages of an employee," such as Plaintiffs and the Class Members, that is not otherwise authorized by law or by the employee.

208.   By withholding wages and overtime compensation from Plaintiffs, pursuant to NYLL § 193 and the cases interpreting same, Defendants made unlawful deductions in wages owed to Plaintiff.

209.   Defendants' failure to pay Plaintiffs wages of any kind for time spent waiting for jobs, picking up and returning time sheets and equipment and traveling between the Workforce7 office or the Schenectady industrial park and job sites, violated NYLL §§ 191 and 193.

210.   Defendants' failure to comply with NYLL §§ 191 and 193 caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon. Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

**SEVENTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNPAID CALL-IN PAY**
**(Brought on Behalf of Plaintiffs and the Class Members)**

211.   Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

212.   Pursuant to NYCRR  142-2.3 and § 142-3.3, non-exempt employees who report to work are entitled to call-in pay that is the lesser of either four (4) hours of pay or the hours of pay in the employee's regularly scheduled shift, whichever is less.

213.   The Workforce7 Defendants willfully violated Plaintiffs and the Class Members' rights by failing to pay wages of any kind, much less call-in pay, on days when they were required to wait at the Workforce7 office for a job assignment only to be informed that there was no work available, in violation of the NYCRR.

214.    The Workforce7 Defendants' failure to pay call-in pay caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon. Plaintiffs and the Class Members are entitled to recover from the Workforce7 Defendants their unpaid call-in pay, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYCRR  142-2.3 and § 142-3.3.

### EIGHTH CAUSE OF ACTION
### NEW YORK LABOR LAW – WAGE STATEMENT VIOLATIONS
**(Brought on Behalf of Plaintiffs and the Class Members)**

215.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

216.    Defendants have willfully failed to supply Plaintiffs and the Class Members a proper wage statement as required by Article 6, § 195(3).

217.    Due to Defendants' violations of the NYLL, Plaintiffs and the Class Members are entitled to recover from Defendants two hundred fifty dollars ($250.00) per employee for each day that the violations occurred or continue to occur, or a total of five thousand dollars ($5,000) per employee, as provided for by NYLL §§ 198(1-d) liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

### NINTH CAUSE OF ACTION
### NEW YORK LABOR LAW –WAGE NOTICE VIOLATIONS
**(Brought on Behalf of Plaintiffs and the Class Members)**

218.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

219.     Defendant has willfully failed to supply Plaintiffs and the Class Members notice as required by Article 6, § 195, or before a change of pay rate, in English or in the language identified by Plaintiffs and the Class Members as their primary language, containing Plaintiffs' and Class Members' rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the regular pay day designated by the employer in accordance with NYLL, Article 6, § 191; the name of the employer; or any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

220.     Due to Defendants' violations of the NYLL, Plaintiffs and the Class Members are entitled to recover from Defendants fifty dollars ($50.00) per employee for each day that the violations occurred or continue to occur, or a total of five thousand dollars ($5,000.00) per employee, as provided for by NYLL, Article 6, § 198(1-b), liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

**TENTH CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Brought on Behalf of Plaintiffs and the Subclass Members)**

221.     Plaintiffs, on behalf of themselves and the Subclass Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

222.     Upon information and belief, the Con Edison Contracts entered into by Defendants contained schedules of the prevailing rates of wages and supplemental benefits or reference to the

NYLL provisions governing payment of prevailing wages to be paid to Plaintiff and the employees performing work pursuant to such contracts.

223.    Those prevailing rates of wages and supplemental benefits were made part of the Con Edison Contracts for the benefit of the Plaintiffs and the other employees performing work pursuant to such contracts. In the event that the contracts or agreements entered into failed to explicitly contain prevailing wage schedules, the prevailing wage requirements were supplemented as a matter of law, requiring Defendants to pay the Plaintiffs and Class Members prevailing wages, daily/weekly overtime and supplemental benefits for all work performed.

224.    Defendants' failure to pay Plaintiffs at the correct prevailing wage rates for straight time, overtime, and supplemental benefits for work performed on Public Works Projects constituted a material breach of the contracts entered into directly or indirectly between Defendants and certain public entities.

225.    As a result of Defendants' failure to pay Plaintiffs at prevailing wage rates, they are entitled to relief from Defendants for breach of contract under New York common law of contracts.

**ELEVENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT & QUANTUM MERUIT**
**(Pled In The Alternative)**
**(Brought on Behalf of Plaintiffs and the Subclass Members)**

226.    Plaintiffs, on behalf of themselves and the Subclass Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

227.    Based on Defendants' failure to pay Plaintiffs and the Subclass Members the appropriate prevailing wage rates, Defendants were unjustly enriched at the expense of Plaintiffs and the Subclass Members.

228.    Equity and good conscience require that Defendants pay restitution to Plaintiffs and

the Subclass Members.

229.   Upon information and belief, when Defendants entered into the contract, they agreed to pay the required prevailing wages, overtime, shift-differential and holiday premiums, and supplemental benefit rates of pay to Plaintiff and other employees who performed work pursuant to the contracts.

230.   Plaintiffs and the Subclass Members provided valuable services to Defendants performing prevailing wage jobs for which Plaintiffs and the Subclass Members expected compensation. Defendants knowingly accepted such services yet failed to pay Plaintiffs and the Subclass Members the reasonable value of such services as defined by the New York State and New York City prevailing wage schedules.

231.   As a result of Defendants' failure to pay Plaintiffs and the Subclass Members at prevailing wage rates on prevailing wage jobs and Defendants' corresponding unjust enrichment, Plaintiffs are entitled to relief from Defendants under New York's common law of unjust enrichment.

232.   As a result of Defendants' failure to pay Plaintiffs and the Subclass Members the reasonable value of the valuable services they rendered, Plaintiffs and the Subclass Members are entitled to relief from Defendants under New York's common law of quantum meruit.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs, on behalf of themselves and all other similarly situated Collective Action Members, Class Members and Subclass Members, respectfully request that this Court grant the following relief:

a.   Designation of this action as a collective action on behalf of the Collective Action Members and ordering the prompt issuance of notice pursuant to 29 U.S.C. § 216(b)

to all similarly situated members of an FLSA Opt-In Class, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b) and appointing Plaintiffs and their counsel to represent the Collective Action Members;

b.  Certification of this action as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of the Class and Subclass, appointing Plaintiffs and their counsel to represent the Class and Subclass and ordering appropriate monetary, equitable and injunctive relief to remedy Defendants' violation of the common law and New York State law;

c.  An order tolling the statute of limitations;

d.  A declaratory judgment that the practices complained of herein are unlawful under the FLSA, NYLL and New York Common Law;

e.  An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with Defendants, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

f.  An award of compensatory damages as a result of Defendants' failure to pay minimum wages and overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

g.  An award of compensatory damages as a result of Defendants' failure to pay all wages to which Plaintiff and the Class Members are entitled, pursuant to the NYLL and supporting regulations;

h.      An award of liquidated and/or punitive damages as a result of the Defendants' willful failure to pay minimum wages and overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

i.      An award of actual and liquidated damages for the non-payment of spread-of-hours pay for each split shift and/or shift worked in New York in excess of ten (10) hours;

j.      An award of actual and liquidated damages for non-payment of call-in pay for each time that Plaintiffs and the Class Members were required to wait at the Workforce7 office and were not assigned work;

k.      An award of liquidated damages for Defendants' failure to pay all wages to which Plaintiff and the Class Members are entitled, pursuant to the NYLL and supporting regulations;

l.      An award of two hundred fifty dollars ($250.00) per Plaintiff and each of the Class Members for each day that the violations of NYLL, Article 6 § 195(3), pertaining to distribution of wage statements, occurred or continue to occur, or a total of five thousand dollars ($5,000.00) per Plaintiff and each of the Class Members as provided for by NYLL, Article 6 § 198(1-d);

m.      An award of fifty dollars ($50.00) per Plaintiff and each of the Class Members for each day that the violations of NYLL, Article 6 § 195(1), pertaining to distribution of wage notice, occurred or continue to occur, or a total of five thousand dollars ($5,000.00) per Plaintiff and each of the Class Members as provided for by NYLL § 198(1-b);

n.      An award of monetary damages to be proven at trial for all unpaid prevailing wages, daily/weekly overtime and supplemental benefits owed to Plaintiff and the

Subclass;

o.     An award of prejudgment and post-judgment interest;

p.     An award of costs and expenses of this action together with reasonable attorneys'

and expert fees; and

q.     Such other and further relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial

by jury on all questions of fact raised by the complaint.

Dated:  New York, New York
        December 9, 2020

                             Respectfully submitted,

                             **PELTON GRAHAM LLC**

                             By: _*/s/ Brent E. Pelton*_
                             Brent E. Pelton
                             pelton@peltongraham.com
                             Taylor B. Graham
                             graham@peltongraham.com
                             Kristen E. Boysen
                             boysen@peltongraham.com
                             111 Broadway, Suite 1503
                             New York, New York 10006
                             Telephone: (212) 385-9700
                             Facsimile: (212) 385-0800

                             *Attorneys for Plaintiffs, the putative FLSA Collective*
                             *and Classes*

# CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of ████████████ Workforce7 Inc.████████ LLC, and/or their respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me prevailing wages and overtime wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct.  I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.  I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees.  I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first.  I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf.  I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

DocuSigned by:

_____
Signature
F82763C3676A474...

Victor Ballast
_____
Printed Name

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of ███████████████████████████Workforce 7 Inc., ████████████████ and/or their respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me prevailing wages and overtime wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct.  I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.  I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees.  I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first.  I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf.  I understand the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

DocuSigned by:

_____
0EF74CD4BFDA46E...
Signature

Luis Simone

_____
Printed Name

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Workforce7 Inc., and/or their respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me prevailing wages and overtime wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.


DocuSigned by:

_____
AEA8B43257C6404...
Signature

_____
Marquis Richardson

Printed Name